Case 2:21-cr-00029 Document 22 Filed on 04/19/21 in TXSD Page 1 of 10

United States District Court
Southern District of Texas
**ENTERED**
April 20, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:21-CR-29 |
| | § | |
| EDMUNDO GARCIA-GARCIA | § | |

## ORDER ON MOTION TO SUPPRESS

Defendant Edmundo Garcia-Garcia stands indicted on one count of knowingly transporting within the United States an alien who had entered the country illegally. D.E. 7. Before the Court is Garcia's motion to suppress (D.E. 15), arguing that the traffic stop and subsequent events leading to his arrest constituted an illegal search and seizure. The Government contends that the police officer had probable cause and reasonable suspicion to make the traffic stop and that the ensuing circumstances presented a classic basis for extending the stop to investigate additional suspicions. D.E. 19.

The Court held an evidentiary hearing on March 23, 2021, at which Officer Eric Fiedler and Garcia testified. During the hearing, Garcia's counsel also raised the objection that Garcia should have been Mirandized during the stop and ensuing investigation. For the reasons set out below, the Court DENIES the motion to suppress.

### FACTS

Officer Fiedler, with seven years of law enforcement experience and approximately one and one-half years of service with the Robstown Police Department, was acting in his capacity as a member of the Nueces County Criminal Interdiction Unit at the time of the events of this case. On December 17, 2020, Fiedler was patrolling

Highway 77 in Robstown in his marked police unit. At approximately 10:15 a.m. on that clear, sunny morning, he was on an entrance ramp, merging onto Highway 77 northbound. To ensure that there was room for him to enter the highway, he looked over his left shoulder and noticed a red Cadillac SLS with four occupants in the left-hand passing lane, also proceeding northbound. As he merged into traffic and the Cadillac passed him, he noticed that only the driver appeared to occupy the car. He found this odd.

Catching up to the Cadillac that was now travelling in the right-hand lane three to four car lengths in front of him, Fiedler used his radio to contact dispatch to run the Cadillac's plates. The dispatcher indicated that records could not confirm that the Cadillac had the required insurance coverage. At that point, approximately 10:20 a.m., Fiedler activated his emergency lights and began to pull the Cadillac over because it is a violation of the law to operate a motor vehicle without the legally required minimum liability insurance coverage.[1] While his dashcam video was recording both his voice and the movement of the Cadillac,[2] Fiedler asked the dispatcher to reconfirm the lack of a record of insurance and she did.

After the Cadillac stopped, Fiedler approached the passenger side of the car on foot, guarding his own safety from the passing highway traffic. He noted that the

---

[1] Tex. Transp. Code §§ 601.051 (insurance required), 601.053 (proof of insurance must be provided upon request of law enforcement).

[2] Fiedler's dashcam recorded the entire traffic stop and the ensuing events, facing forward from the police unit. The video was admitted as Government's Exhibit 1. Fiedler also activated his body cam as he approached the driver. The body cam recorded his entire conversation with Garcia, with the video starting immediately and the audio component beginning after a brief start-up-related delay. This video is included in Government's Exhibit 1.

Cadillac did contain four occupants. He advised them that he had stopped the car for lack of insurance and he asked the driver for his driver's license and proof of insurance. The driver, Garcia, handed him a Texas ID card, which is not a driver's license and does not confer the right to operate vehicles. He did not have proof of insurance available and could not access the car's glove box.

Fiedler then walked around the car to speak to Garcia through his side window. Having difficulty communicating, he asked Garcia to step out of the car and to the side of the road so that they could speak. The traffic was too noisy for them to communicate on the side of the road, particularly because they were wearing masks (a precaution against the COVID-19 pandemic) and because Garcia was speaking Spanish. Fiedler's command of the Spanish language was limited. So he invited Garcia to sit in the front passenger seat of his police unit while he sat in the driver's seat and conversed with Garcia.

Garcia admitted that he did not have a driver's license, explaining that he had not had time to get one. Fiedler then knew that he would be citing Garcia for driving without a license[3] and for failure to produce proof of insurance. It is his practice to continue to chat with persons in this situation to keep them calm while he writes the citation and calls a tow truck to impound the vehicle.

When asked why he did not read Garcia his *Miranda* rights at that time, Fiedler responded that Garcia was not under arrest. The offense of driving without a license usually ends with the car being towed and the driver being taken to a convenience store

---

[3] Tex. Transp. Code § 521.021.

or some other location where he can wait for friends or family to pick him up or arrange for other transportation.

Fiedler asked ordinary questions about who the passengers were and where they were going, consistent with his concerns about the way they had behaved while passing him on the roadway. In the course of the conversation, he became increasingly suspicious that additional criminal activity was taking place. In particular, Garcia did not know the names of his passengers, even though he claimed they were friends. He said he knew them only by nicknames, which translated to nothing more than facially obvious characteristics along the lines of "short guy," "little guy," and "bearded guy." He said that he had picked up the passengers in the Valley and that they told him they had papers to be in this country legally. Fiedler thought that, if these people were indeed his friends, it would be strange that Garcia would ask his friends if they had papers. Garcia first claimed that they were traveling to see family in Houston and then that they were going to do construction work. But as the story shifted, Garcia admitted that they had no luggage or tools with them.

At that point, Fiedler believed that Garcia's story was not credible and he radioed his partner, communicating that he had a possible human smuggling situation on his hands. He then asked Garcia for permission to search the car and Garcia consented. He asked Garcia if there were drugs or weapons in the car and he said, "no." When he asked if there were any hidden compartments in the car, Garcia stopped for a moment to look at the car and then said, "no."

In support of his contention that Fiedler had intended to search the car for drugs without probable cause from the outset, Garcia testified that Fiedler asked for a canine unit to come to the scene. While Fiedler agreed that he had made the request, the request was denied because the canine unit was "inoperable" at the time. The dog's cage would not fit into the available police car to transport it to the location. At any rate, no canine unit participated in the traffic stop. And Fiedler's conduct was consistent with suspicions of human smuggling—not the drug trade—from the time he noticed three passengers and then only one passenger in the vehicle.

Approximately ten minutes into the traffic stop, and with the assistance of Fiedler's partner who had arrived at the scene, the officers had each of the passengers exit the vehicle separately and confirmed that they did not speak English. They did not have luggage or tools. Two said they were from Mexico and one was from Guatamala, having arrived in the United States the night before. They did not have documentation to enter the country legally. And they confirmed that Garcia had picked them up in the Valley near the Mexico border. Nothing in the record indicates that Fiedler spoke to Garcia again after interviewing the passengers. Instead, Fiedler called for Border Patrol assistance. By 11:00 a.m., the car had been towed and Border Patrol had taken Garcia and his passengers into custody.

While Garcia testified, his testimony only addressed the issue of the request for a canine unit and the argument that he had been stopped without probable cause for a search for illegal drugs. He did not controvert Fiedler's testimony. And his complaints do not extend to any actions of the Border Patrol.

## DISCUSSION

### A. Propriety of the Traffic Stop

#### 1. Standard of Review and Rubric

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

The question is whether the seizure was constitutionally permissible. That "inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). Moreover, "a stop may not exceed its permissible duration unless the officer has reasonable suspicion . . . of other criminal activity [in which case] the stop may be lengthened to accommodate its new justification." *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir. 2001).

When the government searches or seizes a defendant without a warrant, the government bears the burden of proving that the search or seizure was supported by probable cause or a reasonable suspicion. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). The standard of proof is by a preponderance of the evidence. *Id*. To satisfy this burden, the police officer must be able to point to specific and

articulable facts which, taken together with rational inferences from those facts, reasonably warrant an intrusion on constitutionally guaranteed rights. *Terry*, 392 U.S. at 21.

### 2. Analysis

Garcia focuses on Fiedler's alleged interest in determining whether Garcia was transporting illegal drugs and posits that Fiedler predicated the stop on the pretext that Garcia had been improperly lingering in the passing lane. Garcia claims that there is no evidence of a traffic violation, meaning that there was no evidence of probable cause or reasonable suspicion for a traffic stop. But he fails to address the evidence that the passengers ducked out of sight while they were passing the marked police unit on the road and that Fiedler had already seen that there were three passengers in the car. And he fails to consider that Fiedler had received confirmation from dispatch that the vehicle was apparently uninsured, which constitutes probable cause.

Garcia does not argue that driving without insurance is an insufficient basis for a traffic stop. To the contrary, he recognizes that such traffic violations can justify a stop and investigation. D.E. 15, p. 4 (citing *Arizona v. Johnson*, 555 U.S. 323, 330-31 (2009)).

Passengers are considered lawfully seized during a routine traffic stop. An investigatory stop is lawful "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona*, 555 U.S. at 327. These encounters include minor traffic violations. *Id*. at 331. And when there is an articulable suspicion of an immigration-related violation, "[t]he officer may question the

driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975).

### 3. Findings

After hearing the evidence, the Court FINDS that Officer Fiedler had probable cause to pull the Cadillac over for lack of the legally required automobile liability insurance, reasonable suspicion to question Garcia about his passengers and the purpose of their travel, and probable cause to detain Garcia and the passengers until Border Patrol agents could take them into custody.  The traffic stop was not impermissibly prolonged and it did not violate Garcia's Fourth Amendment rights because:  (1) he was unable to produce proof of insurance; (2) he was unable to produce a valid driver's license; and (3) none of the occupants in the vehicle were able to provide identification or documentation supporting their lawful presence within the United States.

## B. Necessity of *Miranda* Rights

### 1. Standard of Review and Rubric

A suspect's *Miranda* rights are triggered when he is in custody or "otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977); *Miranda v. Arizona*, 384 U.S. 436 (1996); Tex. Code Crim. P. art. 38.22.  To determine when an investigative detention crosses the line into a custodial situation, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v.*

*Beheler*, 463 U.S. 1121, 1125 (1983).  It is not enough that the investigation takes place in a police facility or that it is done in a coercive environment.  *Id*.; *Mathiason*, 429 U.S. at 495.

The decision is made based on the totality of the circumstances.  The question is "'whether, in light of the objective circumstances of the interrogation,' 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  *United States v. Gonzalez*, 814 F. App'x 838, 842 (5th Cir. 2020) (citations omitted; brackets in original).  More specifically,

> "[W]hen analyzing whether an individual was or was not in custody," we have "repeatedly considered certain key details," such as (1) "the location of the questioning," (2) "the amount of restraint on the individual's physical movement," (3) any "statements made by officers regarding the individual's freedom to move or leave," (4) "the accusatory, or non-accusatory, nature of the questioning," and (5) "the length of the questioning."

*Id*. (quoting *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (collecting cases)).

In the context of a motion to suppress, it is the defendant's burden to show that the information at issue was obtained in the course of a custodial interrogation.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977); *United States v. Patterson*, 393 F. Supp. 3d 456, 464 (E.D. La. 2019).  Only after that burden is met does the burden shift to the government to show a voluntary waiver of *Miranda* rights.  *de la Fuente,* 548 F. 2d. at 533.

### 2. Analysis

Similar to the facts in *Gonzalez*, Garcia was invited to sit in the front seat of the police unit. The doors were not locked and he was not handcuffed. Fiedler did not remove him to a remote location. He was in the natural place he would be if he were to be merely cited for the traffic violation. The nature of the questioning was neither coercive nor accusatory. Fiedler never indicated that Garcia was not free to leave. And the interview took a short amount of time—only that amount necessary to recognize probable cause for further investigation into the citizenship of the passengers.

### 3. Findings

The Court FINDS that Garcia did not meet his burden of proof to show that Fiedler's interview was custodial. The uncontroverted evidence demonstrates that the interview was noncustodial as that term has been defined by the courts for *Miranda* purposes. Therefore, Fiedler was not required to obtain Garcia's waiver of *Miranda* rights before questioning him about his passengers.

### CONCLUSION

For the reasons set out above, the Court DENIES the motion to suppress (D.E. 15).

ORDERED this 19th day of April, 2021.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE